# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 19-CR-276-10** |
| | : | |
| **IVANNY ANTONIO** | : | |
| **FRANCISCO ESTRELLA** | : | **FEBRUARY 5, 2021** |
| | : | |

## MEMORANDUM OF DECISION

Before the Court is Defendant Ivanny Antonio Mr. Francisco-Estrella's Motion to Suppress. Mot. to Suppress, Dkt. 309. Mr. Francisco-Estrella argues that evidence collected during a traffic stop of his vehicle on September 16, 2019 should be suppressed because it was obtained through an illegal search. Further, Mr. Francisco-Estrella argues that evidence collected during his October 29, 2019 arrest, made pursuant to an arrest warrant, should also be suppressed as fruits of the illegal search on September 16, 2019.

The Government filed an opposition arguing that the traffic stop was proper, there was a reasonable suspicion to stop the car under the collective knowledge doctrine, there was no illegal search of Mr. Francisco-Estrella's vehicle, and there is no basis to suppress all of the seized evidence. Opp., Dkt. 385. The Government's opposition did not contain any evidence, such as affidavits or reports. The Court filed a notice thereafter authorizing the Government to file evidence supporting its opposition. Notice, Dkt. 474. The Government filed a supplemental opposition attaching an affidavit from Special Agent ("SA") Jonah Mazzacane from the Drug Enforcement Administration ("DEA"), an affidavit from

1

Officer Leonardi from the Waterbury Police Department ("WPD"), and photographs of a text message exchange.  Supp. Opp., Dkt. 487.

The Court scheduled an evidentiary hearing for this motion.  The hearing took place over two days: October 14, 2020 and November 5, 2020.  Tr. 10/14/2020, Dkt. 669; Tr. 11/5/2020, Dkt. 683.  At the two-day hearing, SA Mazzacane, WPD Officer Luke Leonardi, WPD Officer Michael Nicol, and Mr. Francisco-Estrella testified.  Several exhibits were introduced, including two photographs taken during the September 16, 2019 traffic stop.  Tr. 10/14/2020 at 98, 101; Gov.'s Ex. D, E.

After the hearing, the Government filed a post-hearing memorandum of law where it reasserted many of the arguments previously raised and cited to evidence presented during the trial to support those arguments.  Gov.'s Post-Trial Memo, Dkt. 674.  Mr. Francisco-Estrella filed a reply, again asserting many of the same arguments already made and highlighting testimony provided at the hearing.  Def.'s Post-Trial Memo, Dkt. 678.

The Court has considered the pleadings and the evidence presented.  For the following reasons, the Court GRANTS Mr. Francisco-Estrella's motion as it pertains to suppressing evidence obtained during the September 16, 2019 traffic stop.  The Court DEFERS decision on Mr. Francisco-Estrella's motion as it pertains to suppressing evidence obtained during the October 29, 2019 execution of the arrest warrant pending the supplemental briefing ordered herein.

## I.    BACKGROUND

This case stems from a DEA investigation into a suspected drug trafficking organization ("DTO") believed to be coordinated and controlled by Nestor Sosa-Ortiz.  Tr. 10/14/2020 at 20–21.  The DEA received authorization to intercept ten target telephones used by various suspected members of the Sosa-Ortiz DTO.  Tr. 10/14/2020 at 21.  One of the targeted phones, Target Telephone 4 ("TT4"), was used by Elias Sanchez-Martinez.  Tr. 10/14/2020 at 22.  Sanchez-Martinez is accused of being a heroin and fentanyl dealer who was running a heroin mill out of his home at 6 Charlevoux Street in Waterbury, Connecticut.  Tr. 10/14/2020 at 22–23.

The Government claims that Mr. Francisco-Estrella was intercepted over TT4 beginning in August 2019 and continuing through September 2019 discussing narcotics trafficking with Sanchez-Martinez.  Opp. at 2–3.  The Government claims that during these intercepted calls, Sanchez-Martinez and Mr. Francisco-Estrella discussed drug trafficking activities.  Opp. at 3.

### A.  August 19, 2019

The first event relevant to this decision relates to an August 19, 2019 intercepted call. SA Mazacane testified that on this day, the task force intercepted a call between Sanchez-Martinez and someone using telephone number 475-313-3857 (the "3857 phone"), where the person utilizing the 3857 phone discussed meeting Sanchez-Martinez. Tr. 10/14/2020 at 25, 48.[1]    The task force then

---

[1] Though SA Mazzacane testified that the phone number of the person speaking with Sanchez-Martinez during this call ended with "3587," this was a misstatement. This conclusion is supported by later testimony focusing only on a single phone ending in 3857.

established physical surveillance of Sanchez-Martinez's home. *Id.* at 25, 28. SA Mazzacane testified that one of the task force officers observed a gray Kia and "made a mental note" of the license plate number. *Id.* at 28–29, 61. At the time of the observation, there were multiple vehicles in the area. *Id.* at 28, 68. This observation was not included in a report, but a report prepared more than three weeks later states one of the task force officers "relayed information that this vehicle had been observed before August 19th, 2019, in what is believed to be a drug transaction." *Id.* at 60–61. The officer who made this observation did not testify.

B. <u>September 12, 2019</u>

The second event relevant to this decision relates to a September 12, 2019 intercepted call. SA Mazzacane testified that during this call Sanchez-Martinez and the person using the 3857 phone "were negotiating narcotics." Tr. 10/14/2020 at 29. SA Mazzacane testified that he expected a significant event to happen that day and the task force established surveillance in the area where the event was expected to occur. Tr. 10/14/2020 at 32. He further testified that the person using the 3857 phone stated that he would be there—meaning at Sanchez-Martinez's house—in 15 minutes. *Id.* Approximately 15 minutes after that call, a gray Kia with a license plate registered to Mr. Francisco-Estrella appeared. *Id.* The task force pulled DMV records to get information on this license plate, including a photograph of Mr. Francisco-Estrella. *Id.* at 32–33. The officers surveilling Sanchez-Martinez's home observed someone go from inside the home to the Kia. *Id.* at 56–57. The

task force officers were unable to identify the person or the driver of the Kia. *Id.* at 56–57; 71.

The task force followed the Kia after it left Sanchez-Martinez's residence, but they lost sight of it during the mobile surveillance. *Id.* at 33.  The task force sent units to check the registered vehicle's address, where they observed the vehicle parked in the vicinity of that address. *Id.* at 32–33.

C. <u>September 16, 2019</u>

On September 16, 2019, task force officers observed Mr. Francisco-Estrella's vehicle near 900 Baldwin Street in Waterbury, which was associated with Brayan Gonzalez.  Tr. 10/14/2020 at 34–35.  SA Mazzacane testified that Gonzalez had previously provided a sample of drugs to a confidential source and was actively participating in a drug trade. *Id.* at 35.  Task force officers were given copies of Mr. Francisco-Estrella's DMV photograph by SA Mazzacane and those officers observed Mr. Francisco-Estrella speaking with Gonzalez outside on 900 Baldwin Street. *Id.* at 36.  Those officers did not observe any drug activity. *Id.* at 55 ("We didn't see him conduct a hand-to-hand or anything like that.").  Those officers did not observe Mr. Francisco-Estrella enter the property. *Id.*

After this observation, SA Mazzacane arranged for WPD Officer Leonardi to conduct the walled-off stop. *Id.* at 38.  SA Mazzacane stated that the goal of the stop was "to confirm the subject's identity and that he also had a cell phone of interest and [the task force] may try to place phone calls into it." *Id.* at 38–39.  SA Mazzacane further testified that he explained to Officer Leonardi that

> any information he could [get] would be beneficial to use. If, when we placed a phone call, he heard nothing, that would be one fact. If we

5

placed a call and he could merely here that a phone was going off, that
would be another. And if he was able to actually see a cell phone and
see a phone number that was an incoming call, that would be more
beneficial.

*Id.* at 39.  When asked "Did you explain what he should do if he saw, actually saw,

that third option, the phone?" he responded "Yes, I asked him to photograph it."

*Id.*  SA Mazzacane told Officer Leonardi that the task force "didn't have any

information that there was anything actively going on or that we could have any

clarity on. [The task force was] merely looking to get confirmation of identity and

the cell phone . . . ." *Id.* at 39.  Officer Leonardi and SA Mazzacane discussed the

walled-off stop over the phone, then later communicated with one another also

through text messages.  *Id.* at 39–40.

The Government provided screenshots of the text messages between SA

Mazzacane and Officer Leonardi.  Gov.'s Ex. A.  The text message exchange is as

follows:

[SA Mazzacane:] Out target is still hanging out. When you make the
stop, we'd like to place the call while you guys are speaking with him.
[Ofc. Leoardi:] Sounds good. Do you want us to get into the car or just
ID?
[SA Mazzacane:] Just ID. Maybe make a little small talk, etc. so we can
have time [to] place a . . . couple calls into it.
[Ofc. Leonardi:] No problem.

*Id.*  Twenty-two minutes later, at 4:52 p.m., Officer Leonardi sent a photo to SA

Mazzacane of a white Apple iPhone.  *Id.*  The photo of the phone shows the phone

is receiving an incoming call from a phone number ending in 1615 at 4:51PM.

Gov.'s Ex. D.



The photo depicts a cell phone, which appears to be inside the open center console of the Kia and the reflection of the hand of the person taking the photo.

One minute after the photo of the phone was sent, Officer Leonardi sent a photo to SA Mazzacane of Mr. Francisco-Estrella's commercial driver's license. Gov.'s Ex. A; Gov.'s Ex. E.



SA Mazzacane then asked via text message for Officer Leonardi and his partner's name and badge number, which Officer Leonardi provided.  *Id.*

On September 20, SA Mazzacane asked via text message whether Officer Leonardi made a report, to which Officer Leonardi said he did not.  *Id.*  SA Mazzacane also asked whether the probable cause for the stop was "no turn signal," to which Officer Leonardi responded yes.  *Id.*

SA Mazzacane testified that he was on the phone with Officer Leonardi at the time of the call but that he did not hear the phone ring when the task force officer called.  Tr. 10/14/2002 at 51–52.  SA Mazzacane authored a report on September 16, 2019 where he summarized that "members of the NHDO with the assistance of Waterbury PD positively identified Ivanny Antonio FRANCISCO-ESTRELLA, who was found to be in possession of a firearm."  Def.'s Ex. A.

i.     *Traffic Stop*

Officer Leonardi corroborated SA Mazzacane's recount of their discussion about conducting a walled-off stop.  Tr. 10/14/2020 at 84.  Officer Leonardi learned that the driver of the Kia was a subject of a larger drug trafficking organization.  *Id.* Officer Leonardi testified the SA Mazzacane told him he would need to have his own probable cause to pull over the Kia.  *Id.* at 84.

Officer Leonardi testified that he located the vehicle while on patrol with his partner—Officer Nicol—and observed the driver fail to use a turn signal, which is a motor vehicle violation.  *Id.* at 85.  Officer Nicol was the driver of the patrol car and he also testified that he observed the operator of the Kia fail to use a turn signal. Tr. 11/5/2020 at 6–7 (Nicol).  Mr. Francisco-Estrella testified that he did use his turn signal.  Tr. 11/5/2002 at 46.  He explained that he always uses his turn signals and obeys traffic laws because he has a commercial driver's license and is at risk of being out of work if he gets traffic tickets.  Tr. 11/5/2020 at 46–47.

The Officers pulled the Kia over to the right side of the road and parked the patrol vehicle behind the Kia. Tr. 10/14/2020 at 87 (Leonardi).    Mr. Francisco-Estrella testified that after he was pulled over, he lowered his driver's side window, took his wallet out of his pocket, and put it on his lap in anticipation of the police officers' inquiry.  Tr. 11/5/2020 at 48–50.  Officer Leonardi went to the passenger side of the vehicle, which was closest to the sidewalk, while Officer Nicol went to the driver's side of the vehicle.  Tr. 10/14/2020 at 88 (Leonardi).  Mr. Francisco-Estrella testified that he lowered his passenger window when one of the Officers went to that window.  Tr. 11/5/2020 at 51.   He testified he could not speak English

and attempted to communicate with the officers by gesturing. Tr. 11/5/2020 at 52–53. Officer Leonardi testified that Mr. Francisco-Estrella could only speak very broken English during the stop.  Tr. 10/14/2020 at 89. Officer Nicol testified that Mr. Francisco-Estrella didn't speak English and was not vocal with him.  Tr. 11/5/2020 at 8.

Mr. Francisco-Estrella then handed Officer Nicol his entire wallet, which contained his driver's license.  Tr. 11/5/2020 at 8 (Nicol); Tr. 11/5/2020 at 53 (Mr. Francisco-Estrella).  Inside of his wallet and immediately behind his license was a pistol permit, which Officer Nicol saw when he removed the license.  Tr. 11/5/2020 at 8 (Nicol); Tr. 11/5/2020 at 53 (Mr. Francisco-Estrella).   Officer Nicol asked Mr. Francisco-Estrella if he had a firearm in the car.  Tr. 11/5/2020 at 8 (Nicol); Tr. 11/5/2020 at 53 (Mr. Francisco-Estrella).  Officer Nicol testified that Mr. Francisco-Estrella became nervous and began "reaching around in the car."  *Id.* at 8, 11, 30–31.  Officer Leonardi testified that he did not observe Mr. Francisco-Estrella moving his hands.  Tr. 10/14/2020 at 90.  Mr. Francisco-Estrella testified that his hands were on his steering wheel and when asked where the gun was, he nodded down to his pocket while his hands remained on the steering wheel. Tr. 11/5/2020 at 53–54, 79.  Mr. Francisco-Estrella also testified that he was not nervous during the stop.  Tr. 11/5/2020 at 102.

Officer Nicol asked Mr. Francisco-Estrella out of the car, patted him down, felt a weapon, handcuffed Mr. Francisco-Estrella and removed the firearm from Mr. Francisco-Estrella's pocket.  Tr. 11/5/2020 at 12.  Officer Leonardi did not handle the firearm or return it to Mr. Francisco-Estrella.  Tr. 10/14/2020 at 108. Officer Nicol

retained possession of the firearm throughout the traffic stop. Officer Leonardi's testimony corroborated this sequence of events. Tr. 10/14/2020 at 91.   While detained, Mr. Francisco-Estrella was handcuffed with his hands behind him and was sat down on the sidewalk between the Kia and the patrol car, which was parked behind the Kia.  Tr. 10/14/2020 at 92.

After the firearm was removed and Mr. Francisco-Estrella was detained, Officer Nicol went back to the patrol vehicle "to verify the gun was his and legally owned and registered." Tr. 11/4/2020 at 13.  Each officer admitted he was uncertain if there was any legitimate law enforcement reason to check to see if Mr. Francisco-Estrella was the registered owner of the firearm. Officer Leonardi gave inconsistent testimony about whether there is a legal requirement that a pistol permittee may only possess a firearm registered to him.  Tr. 10/14/2020 at 116; 130–33.  When asked if it was illegal for a permittee to possess a firearm not registered to him Officer Leonardi admitted he did not know.   *See* Tr. 10/14/2020 at 116 ("I'm not sure."), at 118 ("I'm unsure.") at 131 ("From my knowledge . . . ."), at 132 ("I'm pretty sure . . ."). Officer Nicol testified that there are some circumstances where a pistol permittee can possess a firearm not registered to them.  Tr. 11/4/2020 at 14.  Officer Nicol explained that he still checked the registration "[b]ecause [he didn't] know whose firearm it [was], whether it's registered, and [he didn't] know if [Mr. Francisco-Estrella] legally [was] in possession of that firearm."  *Id.*

Officer Leonardi testified that while Mr. Francisco-Estrella was detained on the sidewalk, he walked over to the driver's side door, which remained open.  Tr. 10/14/2020 at 93.  Officer Leonardi testified that he saw the center console was

open, though he didn't see who opened it or when, and in the center console was a cell phone.  Tr. 10/14/2020 at 93, 99, 111.  Officer Nicol testified that he did not open the center console or see it open.  Tr. 11/5/2020 at 20.  Officer Leonardi stated he was not paying particular attention to what Mr. Francisco-Estrella was doing while inside the vehicle and whether he or someone else opened the center console.  Tr. 10/14/2020 at 112. Mr. Francisco-Estrella testified that the center console was closed when he was stopped and he did not open it, he found it open and its contents in disarray when he returned to the Kia, and the console never opened on its own. 11/5/2020 at 66–67.

While Mr. Francisco-Estrella was detained on the sidewalk behind his vehicle, Officer Leonardi called the DEA agent to tell him he could see a phone.  Tr. 10/14/2020 at 94.  SA Mazzacane then told a member of the task force to call the 3857 phone. Tr. 10/14/2020 at 44.   Officer Leonardi testified that the phone responded to a call, and Officer Leonardi took a photo of the phone as the call was incoming.  Tr. 10/14/2020 at 94; Gov.'s Ex. D.  Officer Leonardi could not remember whether he heard the phone ringing.  Tr. 10/14/2020 at 103. SA Mazzacane testified he did not hear the phone ring while on the phone with Officer Leonardi.  Tr. 10/14/2020 at 51.  Officer Leonardi testified that he was outside of the vehicle leaning in with his arm when he took the photo of the phone, but his head, feet and torso remained outside the vehicle.  Tr. 10/14/2020 at 94–95.  The photo of the phone includes a reflection of the finger and back of the hand of the person who took the photo. Gov.'s Ex. D.

Mr. Francisco-Estrella testified that, while sitting on the curb detained behind his Kia, he saw the police officer who initially approached his passenger window sit inside his vehicle, first sitting on the driver's side and then on the passenger side. Tr. 11/5/2020 at 86. Mr. Francisco-Estrella changed his testimony later during re-cross, where he said he could not remember if the same officer sat in both seats or if it was one officer in one seat and then at a different time the other officer in the other seat. Tr. 11/5/2020 at 106. The Court observed that Officer Leonardi and Officer Nicol look similar in that they are both Caucasian males of approximately the same age, weight, and height. Though Mr. Francisco-Estrella characterized what this officer was doing as "searching" or "looking" he did not see the officer moving around but testified he inferred his vehicle was searched because his glove compartment and center console were open and the contents of the glove compartment were in disarray.[2] Tr. 11/5/2020 at 89–90.

Officer Leonardi testified that he took a picture of Mr. Francisco-Estrella's driver's license from the patrol car. Tr. 10/14/2020 at 100, 114; Gov.'s Ex. E. The photograph of the license was also sent via text message to SA Mazzacane. Gov.'s Ex. A. In the photograph, there is a steering wheel behind the license. Tr. 10/14/2020 at 101; Gov.'s Ex. E. Officer Leonardi testified he took the photo of the license while sitting in the driver's seat of the patrol vehicle. Tr. 10/14/2020 at 101.

---

[2] Attached to the Motion to Suppress were two affidavits from Jose Gomez and Pedro Luis Garcia, however, these affidavits were not admitted as evidence nor were these witnesses called to testify. The Court is unable to ascertain the credibility of the affiants based on the affidavits alone. Considering there was competing live testimony on this issue, the Court will not consider these affidavits as providing credible evidence for the purpose of this decision.

Officer Leonardi testified that Officer Nicol was in the driver seat, but he got out of the vehicle to let Leonardi sit down to take this photo. Both officers arrived at the scene in the patrol car and Officer Leonardi did not testify why Officer Nicol needed to exit the vehicle for him to sit down. Tr. 10/14/2020 at 114. Officer Nicol vigorously contradicted Officer Leonardi's testimony denying six times that he got out of the patrol vehicle. Tr. 11/5/2020 at 23, 36, 40, 41, 43, 44. Officer Leonardi sent the photograph to SA Mazzacane at 4:53PM, two minutes after the time displayed in the photo of the phone. Gov.'s Ex. A.

After learning that the firearm was registered to Mr. Francisco-Estrella, Officer Nicol put the firearm in Mr. Francisco-Estrella's vehicle. Tr. 11/5/2020 at 16. He could not remember where inside the vehicle he put the firearm. *Id.* Mr. Francisco-Estrella testified that when he returned to his vehicle after the stop, the gun was in his glove box and the bullets were loose in the glove box. Tr. 11/4/2020 at 57, 100. Mr. Francisco-Estrella was given a verbal warning and left. Tr. 10/14/2020 at 104 (Leonardi).

D. Investigation into Phone Number

SA Mazzacane testified about other investigatory efforts made to determine who was using the 3857 phone during the intercepted calls. Tr. 10/14/2020 at 47–51. SA Mazzacane testified that he received information from a service provider based on an administrative subpoena for this phone number, which lists the customer as a Joseph Torres with an address at 1430 North Main Street in Waterbury. *Id.* at 48. SA Mazzacane did not find any connection between the

14

matters under investigation and either Joseph Torres or he address to which the phone number was registered. *Id.*

### E. Arrest Warrant

A federal arrest warrant was issued for Mr. Francisco-Estrella. *See* Def.'s Ex. J (DEA Post-Arrest Warrant Report). Neither party provided the Court with a copy of the arrest warrant, nor its application. Defense counsel states in a footnote in its post-trial memo that this affidavit "is part of the Court's file"; Def.'s Post-Trial memo, Dkt. 678 at 5 n.4; but the Court did not find the document in the record.

On October 29, 2019, when law enforcement arrived at Mr. Francisco-Estrella's home to arrest him, his wife answered the door and allowed law enforcement inside where Mr. Francisco-Estrella was sleeping. Def.'s Ex. J. Law enforcement woke Mr. Francisco-Estrella and handcuffed him. *Id.* Mr. Francisco-Estrella does not speak English, so his step-daughter who was present assisted in translation. *Id.* Mr. Francisco-Estrella was read his rights in Spanish and was given a Spanish consent to search form, which he signed. *Id.* As a result of the search, law enforcement seized: (1) several small clear plastic bags containing a light brown powdered substance suspected to be heroin with an approximate weight of 35.50 grams, (2) three cell phones, (3) a spiral notebook containing notes, numbers, and passwords, (4) miscellaneous packaging materials, rubber bands, plastic bagging, tape dispensers, brush and protective eye wear, and (5) two empty containers of used cutting agent. *Id.*

## II.     LEGAL STANDARD

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.   "To 'safeguard Fourth Amendment rights generally,' . . . the Supreme Court has crafted the exclusionary rule, requiring the exclusion of evidence '[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights,' . . . ."   *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (citing to *Herring v. United States*, 555 U.S. 135, 139–40, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) and *Davis v. United States*, 564 U.S. 229, 237, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011).   Because the exclusion of evidence "exacts a heavy toll on the justice system . . . the exclusionary rule does not apply whenever suppressing evidence 'might provide marginal deterrence.'" *United States v. Raymonda*, 780 F.3d 105, 117 (2d Cir. 2015) (citing to *Herring*, 555 U.S. at 141)).

## III.    DISCUSSION

There are several Fourth Amendment events that are the subject of the motion to suppress.  The Court will address each as raised by the parties.

### A. <u>Legality of the Stop</u>

The Court must first determine whether the September 16, 2019 traffic stop conducted by Officer Leonardi and Officer Nicol was legal at its inception.  Under *Terry v. Ohio*, 392 U.S. 1, 888 S. Ct. 1868, 20 L. Ed. 2d 1868 (1968), a police officer may conduct a brief investigatory stop if they have reasonable suspicion that criminal activity may be afoot. To establish reasonable suspicion, the officer "must

be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. This standard requires a "minimal level of objective justification" for making a stop, which the Supreme Court has defined as "more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *United States v. Sokolow*, 490 U.S. 1, 2, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). *See also United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992).

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). The Second Circuit has further held "unambiguously" that the lesser standard, "reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop." *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009). A vehicle stop does not violate the Fourth Amendment's prohibition against unreasonable seizures, "even if a reasonable officer would not have stopped the motorist absent some additional law enforcement objective." *Whren*, 517 U.S. at 806. In *United States v. Dhinsa*, 171 F.3d 721 (2d Cir. 1998), the Second Circuit upheld a vehicle stop even after the officers testified that the violation "played no role in their decision to make the stop and they did not intend to ticket the driver." *Id.* at 723.

Here, the testimony between Officers Leonardi and Nicol is in direct conflict with Francisco Estrella; where the Officers testified that Mr. Francisco-Estrella failed to use his turn signal and Mr. Francisco-Estrella testified that he did use his

turn signal.  The Government argues that the Court should find Mr. Francisco-Estrella's testimony not credible for two reasons.  First, the Government argues that Mr. Francisco-Estrella has obvious reasons to lie.  This is because Mr. Francisco-Estrella is facing very serious charges that carry a mandatory minimum of five years if convicted.[3]  Second, the Government argues that Mr. Francisco-Estrella's testimony—that he always obeys traffic laws because violations of the traffic laws would put his employment at risk—is not credible because he was found in possession of narcotics during the consensual search and possession of narcotics would also logically put his employment at risk.

To resolve this conflicting testimony about whether a turn signal was or was not used, the Court must assess the credibility of the claims made by Officer Leonardi, Officer Nicol, and Mr. Francisco-Estrella.

Officer Leonardi testified that he observed "the driver failed to make a traffic signal – turn signal," which is a motor vehicle violation. Tr. 10/14/2020 at 85.  The Court finds Officer Leonardi was not credible.  His testimony on three subjects are not believable. The first is his testimony about the way he photographed the phone in Mr. Francisco-Estrella's Kia.  Officer Leonardi testified he took this photo by "leaning in from the outside" "with [his right] arm only," which was straight in front of him.  Tr. 10/14/2002 at 94–95, 119.  He testified that the driver side "door was open" and his "torso was facing the car."  *Id.*  He testified his head and chest were not in the car; but he was unsure if he bent down or whether his shoulder was in

---

[3] Francisco-Estrella has been indicted for Conspiracy to Distribute and to Possess with Intent to Distribute Heroin and Fentanyl in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(i).  Indictment, Dkt. 25.

the car.  *Id.* at 99, 120.  He used his cell phone to take the picture, which was "directly over [the console]" and the "back [of his phone] was facing directly on the console."  *Id.* at 96–97.

The photo of the cell phone belies Officer Leonardi's description of how it was taken.  The photo depicts a cell phone receiving an incoming call at 4:51PM.  Gov.'s Ex. D.  The phone is lying in a center console which appears to be approximately two to three inches deep.  *Id.*  The phone depicts a reflection of the photographer's hand and a camera positioned directly above and nearly parallel to the phone, with only a slight angle.  *Id.*  The reflection of the hand is inconsistent with Officer Leonardi's testimony.[4]  The way the knuckles are depicted shows that Officer Leonardi could not have taken this photo single handedly from outside the vehicle as he testified.  Further, the reflection shows part of the back of Officer Leonardi's hand facing away from the driver's seat.   Meaning his hand was extended beyond the center console.  Officer Leonardi is not a very tall person or someone with very long arms.  Though the Court was not provided with the exact measurements of the vehicle seat and Officer Leonardi's arm, the driver's seat must have been at least large enough for Mr. Francisco-Estrella to sit in it based on the incontrovertible truth that he was sitting in the driver's seat.  The Court

---

[4]  The defense sought to put on evidence through an expert relating to this photograph, to which the Government objected.  Mot. to Preclude, Dkt. 574; Tr. 10/14/2020 at 5–11.  The Government argued that "Deciding whether the officer was inside or outside of the car when he took the picture is a simple factual determination and one that does not require an expert opinion, as evidenced by defense counsel's intent to call three lay witnesses to testify regarding this contested fact."  Mot. to Preclude at 8.  At the hearing, the Government reiterated that "[i]t simply does not require an expert opinion."  Tr. 10/14/2020 at 5.

cannot find that Officer Leonardi could have taken this photo, as it is depicted, by simply extending one arm deep enough into the car to slightly pass the center console while also putting no other part of his body in the car.  Thus Mr. Francisco-Estrella's testimony that an officer sat in the driver's seat is more credible than Officer Leonardi's testimony that he did not sit in the Kia.

The second subject on which Officer Leonardi's testimony is not credible concerns where he was when he photographed Mr. Francisco-Estrella's license. Officer Leonardi testified the photo of the license was taken "in the police car, my patrol car."  Tr. 10/14/2020 at 100.  He further testified that behind the license in the photo is a "steering wheel."  *Id.* at 101.  When asked again where the photo was taken, he repeated in "[m]y patrol vehicle."  *Id.*  On cross, when asked where his partner was when he took the photo, he said "I believe he had gotten out to let me sit down."  *Id.* at 114.  On cross, counsel asked why he would have gotten out if he was "still running the pistol," which Officer Leonardi replied "Yes, but it takes a couple of minutes to get back from dispatch."  *Id.* at 115. Contrary to Officer Leonardi's assertion, Officer Nicol testified with vigor, six times that he did not get out of the driver's seat.  Tr. 11/5/2020 at 23, 36, 40, 41, 43, 44.  Officer Nicol's confidence with his response that he did not get out of the patrol car to let Officer Leonardi take a photo suggests Officer Leonardi was not telling the truth.

Further, it also defies logic to credit Officer Leonardi's testimony that Officer Nicol exited the driver's seat to allow Officer Leonardi to sit down and take the photo of the license.  First, one does not need to sit down to take a photo.  Officer Leonardi testified he was standing when he took the photo of the cellphone.  It is

illogical that he needed to sit down to take a photo of something in his hand, when he could take a photo of something in a vehicle while standing.  It is also illogical that Officer Nicol would need to relinquish his seat to enable Officer Leonardi to photograph the license.  If Officer Leonardi needed to sit down, he could have sat in the front passenger seat of the patrol car where he was sitting when he and Officer Nicol were following Mr. Francisco-Estrella.

As the Government points out, the Court should consider any motivation each witness has to tell less than the whole truth.  Both Officer Leonardi and Mr. Francisco-Estrella have a motive to be less than honest or to mis-remember. Officer Leonardi was motivated to assist in a DEA investigation and gather evidence against Mr. Francisco-Estrella.  That motivation may have caused him, just as Mr. Francisco-Estrella's desire for liberty may have motivated him, to misremember or not to tell the whole truth.

As an aside, the Court does not credit the Government's unsupported claim that a drug offense would jeopardize Mr. Francisco-Estrella's CDL license. In addition to the fact that the Government offers no evidence to support this claim, the Court notes that in the record of tens of cases on its docket, individuals with criminal convictions, including drug convictions, obtain and retain their commercial driver's license and work as commercial drivers.

Mr. Francisco-Estrella's testimony that he saw a police officer sitting in his driver's seat is more credible than Officer Leonardi's denial that he entered the vehicle.  Based on the angle of the license compared to the steering wheel together with the credible supporting testimony of Officer Nicol, the evidence logically leads

the Court to the conclusion that it was the Kia's steering wheel captured in Officer Leonardi's photograph of Mr. Francesco-Estrella's license not his patrol vehicle. The Court finds Officer Leonardi's testimony that he did not sit in Mr. Francisco-Estrella's vehicle unbelievable

The third subject on which the Court finds Officer Leonardi's testimony unbelievable are his justifications for the investigation into the legality of Mr. Francisco-Estrella's possession of a firearm. Mr. Francisco-Estrella produced an ostensibly valid pistol permit and Officer Leonardi admitted there is no requirement that a firearm be registered to the permitholder. When asked on direct examination whether there is "any [such] requirement under the law" he responded "No." Tr. 10/14/2020 at 116. When asked by the Court whether there is "any legal basis to investigate whether the permit holder was the owner of the firearm" he responded "from my knowledge, no." *Id.* at 130. Recognizing the significance of his answer, he then contradicted himself and said "[f]rom my knowledge, it has to be registered to that person with the pistol permit because it has that – it's registered to the pistol permit holder." *Id.* at 131. This exhibits that Officer Leonardi was willing to testify conclusively about something he did not know for certain or he was willing to testify falsely to defend his actions. While this testimony may support the conclusion that Officer Leonardi simply made a mistake, his effort at rehabilitation, coupled with his demeanor while doing so, also buttresses the Court's conclusion that Officer Leonardi was motivated to testify falsely.

Based on the foregoing, the Court does not rely on Officer Leonardi's testimony that he saw Mr. Francisco-Estrella fail to use a turn signal to establish probable cause that a traffic violation occurred.

Next, the Court must determine if Officer Nicol credibly testified that he saw Mr. Francisco-Estrella failed to use his turn signal. Tr. 11/4/2020 at 7 ("the operator failed to turn on his right turn signal.").  Officer Nicol's other testimony was uncontradicted, save by that of Mr. Francisco-Estrella.  However, Officer Nicol did not corroborate the Officer Leonardi's incredulous testimony, give conflicting testimony, or testify to matters which defy logic, suggesting he would testify falsely or has an improper motive.  The Court finds credible and credit's Officer Nicol's testimony that he observed Mr. Francisco-Estrella fail to signal.

The conclusion that Officer Nicol's testimony about the probable cause for the stop does not wholly diminish Mr. Francisco-Estrella's credibility because he testified to the contrary.  The Court found Mr. Francisco-Estrella credible when he testified before the Court.  His testimony before the Court was consistent leaving the Court with the impression that he was being honest.  In addition, contrary to the Government's assertion, Mr. Francisco-Estrella testified truthfully that he could lose his CDL license for committing motor vehicle violations. https://portal.ct.gov/DMV/Suspension/Suspension/Disqualification-of-a-Commercial-Driver-License-or-License-with-Public-Passenger-Endorsement

Mr. Francisco-Estrella was being followed by a police car.  It would be difficult to find anyone, particularly someone who is a non-English speaking minority such as Mr. Francisco-Estrella, who would not be distracted by a police

vehicle following them.  He may honestly believe he used his turn signal because he routinely uses his turn signal but did not do so here because he is not routinely being followed and may have been distracted by police.

The Court finds Officers Nicol's testimony that Mr. Francisco-Estrella did not signal credible therefore, there was probable cause to conduct the traffic stop.

### A. Extension of Stop

Now that the Court has determined that the stop was legal, it must then determine whether there was an illegal extension of the stop.  Under Fourth Amendment jurisprudence, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."  *Rodriguez v. United States*, 575 U.S. 348, 350, 135 S. Ct. 1609, 1612, 191 L. Ed. 2d 492 (2015).  "Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop."  *Id.* at 355.  "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.*

In *United States v. Gomez*, 877 F.3d 36, 93 (2d Cir. 2017), the Second Circuit found that a police officer who prolonged a traffic stop by asking unrelated investigatory questions and did not have an independent reasonable suspicion of a different offense violated the Fourth Amendment.  However, the Second Circuit in *Gomez* found that the good faith exception applied under those circumstances because at the time the stop was made, the Supreme Court decision in *Rodriguez* making such extension illegal had not yet been decided.  *Id.* at 93–94.

24

Here, the issue is whether the Officers illegally extended the stop by taking time to check whether the pistol in Mr. Francisco-Estrella's possession was registered. As the Court explained above, the Court does not find credible Officer Leonardi's testimony about the requirements for registering a firearm. When Officer Nicol was asked "why did you have to check the pistol permit?" he responded: "To verify the gun was his and legally owned and registered." Tr. 11/4/2020 at 13. However, when asked whether a firearm purchased out of state needs to be registered, he said "[n]o, Connecticut is not a mandate state for that." *Id.* at 14. When asked "So there are circumstances where a person can legally possess a firearm, be a permit holder in Connecticut, and not have to register the handgun, correct?" he responded, "That is correct." *Id.* He was then asked again "what's the point of checking to see whether the firearm is registered to a permit holder?" he responded "Because I don't know who firearm it is, where it's registered, and I don't know if he legally is in possession of that firearm." *Id.*

Officer Nicol did not set forth any articulable fact that would support a finding that he had a reasonable suspicion that the firearm removed from Mr. Francisco-Estrella was somehow illegally possessed. Further, Officer Nicol did not explain how pulling registration information would have even established whether it was illegally possessed because he testified that he knew the firearm did not have to be registered to him. In other words, as outlined above in Officer Nicol's testimony, even if that firearm was not registered to Mr. Francisco-Estrella it would have changed nothing. The only circumstance where the registration would matter is if an officer had a reasonable articulable suspicion the gun was stolen. Neither

officer testified they suspected it was. The Court finds that Officer Nicol's testimony about why he checked the registration of the firearm is not credible.

The more persuasive reason was to extend the stop so that S.A. Mazzacane would have enough time to make the call. S. A. Mazzacane instructed Officer Leonardi to extend the stop with small talk.  When that was impossible, because Mr. Francisco-Estrella did not speak English, the officers unnecessarily checked the registration of the firearm without reasonable articulable suspicion that it was stolen. Those facts suggest an illegal extension of the stop for the sole purpose of affording S. A. Mazzacane enough time to place a phone call and link Mr. Francisco-Estrella's telephone to the illegal activity under investigation.

As stated above, suppression of evidence under the exclusionary rule should be made when the policies behind the exclusionary rule are present.  The exclusionary rule "operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" *United States v. Leon*, 468 U.S. 897, 906, 104 S. Ct. 3405, 3412, 82 L. Ed. 2d 677 (1984) (citation omitted). "Accordingly, '[a]s with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.'" *Id.* at 908 (citation omitted).

Suppression of the evidence obtained during the illegal extension of the traffic stop would have deterrent effect, not just of the patrol officers conducting these traffic stops but also on the investigators who engage patrol officers for this purpose.  SA Mazzacane testified that the purpose of this stop was to have enough

time to make a phone call to determine whether Mr. Francisco-Estrella was in possession of a phone connected to the investigation.  Though there may be some circumstances where it is possible to collect this information without illegally extending a stop, that is not the case for all walled-off stops, such as the stop here.  Further, though SA Mazzacane said "we're rather conservative in using" walled-off stops, he also testified that the task force utilized roughly six or seven in this investigation alone between May and October 2019.  Tr. 10/14/2020 at 36.  Walled-off stops are not so rare and unlikely to be repeated.  The Court's decision today can inform law enforcement officers of the limits of the use of walled-off stops and to deter the illegal extensions of traffic stops.

Therefore, the Court finds that Officers Leonardi and Nicol unlawfully extended the traffic stop by checking to see if the firearm was registered to Mr. Francisco-Estrella, and that this conduct was not made in good faith but was made for the purpose of obtaining sufficient time to collect evidence against Mr. Francisco-Estrella or reasons separate and distinct from the purpose of the traffic stop.  Thus, the evidence obtained during the illegal extension of the traffic stop is suppressed pursuant to the exclusionary rule.

B. <u>Search</u>

Even though the Court has found that the evidence obtained during the illegal extension of the traffic stop is suppressed, the Court will still address whether Officer Leonardi searched the vehicle in violation of the Fourth Amendment.  This inquiry requires two steps: first, whether the entry itself was a search, and if so, second, whether the search was unreasonable.

The Supreme Court's decision in *New York v. Class*, 475 U.S. 106, 106 S. Ct. 960 89 L. Ed. 2d 81 (1986) is instructive.  In *Class*, a police officer reached into the defendant's vehicle to move a piece of paper that was obstructing the exterior view of the VIN.[5]  *Id.* at 108.  The Court agreed with the lower court and found that the intrusion into that space constituted a "search."  *Id.* at 115.  The Court explained that "while the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police."  *Id.* 114–15.  The Court ultimately found the search was reasonable, and thus not a constitutional violation, because the search was the least intrusive means necessary to satisfy the greater governmental interest in obtaining the VIN of the vehicle.  *Id.* at 116–19.  The Court in *Class* concluded by saying:

> We note that our holding today does not authorize police officers to enter a vehicle to obtain a dashboard-mounted VIN when the VIN is visible from outside the automobile. If the VIN is in the plain view of someone outside the vehicle, there is no justification for governmental intrusion into the passenger compartment to see it.

475 U.S. at 119.  The justification for the intrusion is key.

In *United States v. Ryles,* the Fifth Circuit held that a police officer who put his head inside the defendant's vehicle to smell marijuana was a search, finding that the officer "intruded inside a space that, under most circumstances, is

---

[5] The Court in *Class* explained the importance of the VIN in many forms of Government and is required under federal law to be placed in plain view of someone outside the automobile.  474 U.S. at 111–12.  However, older later model vehicles were manufactured with the VIN on the doorjamb.  *Id.* at 108.  The Court held that there is no reasonable expectation of privacy in the VIN.  *Id.* at 114.

protected by a legitimate expectation of privacy."  988 F.2d 13, 15 (5th Cir. 1993). The Fifth Circuit explained that "[a]lthough there is generally a diminished privacy interest in an automobile, as opposed to a residence . . . a driver or car owner does not abandon all expectations of privacy."  *Id.* at 15 (citing to *Chambers v. Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970)).

In *United States v. Montes-Ramos*, the Tenth Circuit found that the police officer who leaned his head approximately two inches into the defendant's car and sniffed for marijuana was a search even if it was minimal because "[t]he fact that the intrusion was minimal does not affect the analysis.  347 F. App'x 383, 388 (10th Cir. 2009).  Citing to *Kyllo v. United States*, 533 U.S. 27, 37, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001), the Tenth Circuit explained that "there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor."  *Id.*

In determining reasonableness, there is no 'ready test,' rather courts should engage in balancing of the need to search and the invasion itself.  "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, justifiably warrant that intrusion." *Class,* 475 U.S. at 116–17 (citing to *Terry,* 392 U.S. at 21)). "This test generally means that searches must be conducted pursuant to a warrant backed by probable cause."  *Id.* at 117.

Here, if the Court took Officer Leonardi's testimony as true about the way he took the photo of the phone, it would constitute a search under the above cited cases.  It is reasonable to infer from Officer Leonardi's testimony that the content

of the cellphone's screen was not in plain view, sufficient to photograph the incoming call number.  Consequently, he admitted he took the photo from inside the vehicle. He put his hand and arm inside the vehicle with his cell phone, which was utilizing the camera function in order to document the inside of the vehicle from a perspective inside the vehicle.  Putting his hand and arm inside Mr. Francisco-Estrella's vehicle to photograph its contents is no different than an officer putting his head inside a vehicle to smell its contents.  He used the camera to obtain a better and documented view of evidence that could, and was taken with the intention to, later be used against Mr. Francisco-Estrella in a criminal case.

As stated above, the Court does not find credible Officer Leonardi's testimony about the way this photo was taken.  Also as stated above, the Court found that Officer Leonardi sat inside Mr. Francisco-Estrella's vehicle, which is well beyond the intrusions in *Ryles* that constituted a search.

 Beyond that, given the officers willingness to illegally extend the stop to assist SA Mazzacane to obtain evidence against Mr. Francisco-Estrella, the Court finds credible Mr. Francisco-Estrella's testimony that his center console was closed at the time of the traffic stop and opened between the time he was ordered to exit his vehicle and the time he was allowed to return to his vehicle. Tr. 11/5/2020 at 66–67.  The center console was not known to open on its own, requiring a button to be pushed in order to open it.  *Id.* at 67–68.

The officers offer no credible testimony to call this conclusion into question. Officer Leonardi testified that he saw the center console was open, though he didn't see who opened it or when.  Tr. 10/14/2020 at 93, 99, 111.  Officer Nicol testified that

30

he did not open the center console or see it open.  Tr. 11/5/2020 at 20.  Officer Leonardi did not testify he saw the cellphone in the console when he approached the vehicle and that he was not paying particular attention to what Mr. Francisco-Estrella was doing while inside the vehicle or whether he or someone else opened the center console.  Tr. 10/14/2020 at 112.  The Court doesn't find Officer Leonardi's testimony credible in this regard.  It is well known that police officers are trained to be observant.  Their safety depends on their observations of and reactions to threats. They are especially vigilant during encounters with individuals of interest to other law enforcement officers.

In this case, they would have been especially observant of a cellphone. Officers Leonardi and Nicol were tasked to conduct a traffic stop of Mr. Francisco-Estrella to observe whether his phone would respond to a call from one of the task force officers.  Logic dictates that immediately upon approaching the vehicle during their routine visual safety sweep of the interior of the vehicle they would have looked for Mr. Francisco-Estrella's cellphone.  If, at the time the officers approached the vehicle, the cellphone was visible in the open console where it was photographed, both he and Officer Nicol would have noticed it.   Further, it would have made a sufficient impression for them to recall seeing it.

By comparison, Mr. Francisco-Estrella's testimony that he remembered the console was closed is logical. This is because it is unlikely he, or anyone else, would drive with their center console that acts as an arm rest open.  He didn't open the center console to get his driver's license because his license was in his wallet, which was in his pocket prior to the Officers arriving at the window.  Mr. Francisco-

Estrella did not have a reason to open the center console.  But Officer Leonardi did, because he was tasked with finding Mr. Francisco-Estrella's phone.  The sum of the evidence supports the finding that Officer Leonardi opened the center console.  There can be no doubt that that conduct constitutes a search under the Fourth Amendment.

Now that the Court has found that Officer Leonardi conducted a 'search,' the issue is now whether this conduct was reasonable.  This case is unlike *Class*, where the intrusion was minimal when compared to the government interest in viewing the VIN.  Officer Leonardi's intrusion was in no way related to the traffic stop, which was for a failure to use a turn signal.  Officer Leonardi presented no specific and articulable facts that would justify this intrusion nor did SA Mazzacane. The only information Officers Leonardi and Nicol had about Mr. Francisco-Estrella came from SA Mazzacane who explained to Officer Leonardi that he

> didn't have any information that there was anything actively going on or that we could have any clarity on. [The task force] was merely looking to get confirmation of identity and the cell phone, if it was either there or not there, and that there was no need to search the vehicle; [Officer Leonardi] should just conduct himself the way he normally would under routine Waterbury Police Department [protocols for a] motor vehicle stop.

Tr. 10/14/2020 at 39.  This testimony establishes the task force did not have a basis for conducting or authorizing Officer Leonardi to conduct a search of the vehicle.  Meaning, the only specific and articulable facts relating to criminal activity were that of the minor traffic violation.  This minor traffic violation does not provide cause for Officer Leonardi's intrusion.

Further, this intrusion went beyond what was necessary for the governmental interest to identify the user of the suspected cellphone. Unlike *Class*, where the only way to obtain the VIN was to move the document, here law enforcement could have simply called the phone number and Officer Leonardi could have testified that he saw, from entirely outside the vehicle, the phone respond to an incoming call if the phone was visible from outside the vehicle. The Governments attorney stated at the hearing that this alternative could have been an option and that "after this . . . case [she] will be recommending that there are never any pictures taken." Tr. 11/4/2020 at 148.

The intrusion here was beyond what was reasonable, or if Officer Leonardi is to be believed necessary, to confirm that the suspected cellphone was being used by Mr. Francisco-Estrella. The photograph makes clear that Officer Leonardi was in the vehicle. Even crediting his denial that he was sitting in the vehicle when he photographed the license, the photograph of the cellphone shows, that at the very least, his hand, arm and likely his head and upper torso were in the vehicle. As such he entered the vehicle to take the photograph of the cellphone.

The excessive nature of the intrusion weighs heavily when compared to the Government's interest in obtaining this evidence. Therefore, in addition to the illegal extension of the traffic stop, the evidence obtained when Officer Leonardi intruded into Mr. Francisco-Estrella's vehicle, was the product of an unreasonable

search in violation of the Fourth Amendment.[6]  The evidence collected during this stop is suppressed pursuant to the exclusionary rule.

### C. Fruits of the Poisonous Tree

Mr. Francisco-Estrella argues that both the photographs taken during the traffic stop and evidence obtained through the arrest warrant should be suppressed as fruits of the poisonous tree.  Mot. to Suppress at 15.  In support of the claim that the evidence collected during the arrest should be suppressed, Mr. Francisco-Estrella argues that the sole evidence at the time of the arrest warrant tying him to the 3857 phone was the illegal stop and without the connection between him and the phone, there would not have been probable cause for the arrest warrant.  Mot. to Suppress at 16–17.  Mr. Francisco-Estrella further argues that "[t]he determination that the 475-313-3857 phone number was associated with a phone in the possession of Mr. Francisco-Estrella, determined solely as the result of the motor vehicle stop, was critical to the judge's finding probable cause to issue the arrest warrant, and thereby obtain the consent of Mr. Francisco-Estrella to the search of his bedroom and any statements he made at the time of his arrest."  *Id.* at 16.

---

[6] Though the Government presented some argument that even if this was a search it was not improper because there was reasonable suspicion justifying the search under the collective knowledge doctrine, the Government abandoned this argument claiming that "because the WPD officers did not search the car, that line of argument is not pursued herein."  Opp. at 20 n.8.   The Court nonetheless addressed the argument in the above decision.  In addition to not pursuing the reasonable suspicion justification argument, the Government did not pursue any argument under an exception to the warrant requirement or exclusionary rule.

Mr. Francisco-Estrella has not provided the Court with a copy of the arrest warrant affidavit and the Court is unable to determine based on the pleadings alone whether the illegally obtained evidence was relied on at all in the arrest warrant affidavit and if it was, to what extent.  Mr. Francisco-Estrella is ordered to file a secondary brief setting forth the evidence upon which his fruits of the poisonous tree argument relies as well as applying the law to those facts.  Mr. Francisco-Estrella's second brief is due within twenty-one (21) days of this order.  The Government will have twenty-one (21) days to respond.

## CONCLUSION

For the foregoing reasons, the Court grants Mr. Francisco-Estrella's motion to suppress the photograph's taken by Officer Leonardi during the September 16, 2019 traffic stop and any testimony from either Officer Leonardi on whether the phone inside Mr. Francisco-Estrella's vehicle responded to a call from one of the task force officers during the traffic stop.

The Court defers decision on Mr. Francisco-Estrella's motion to suppress the evidence seized during the execution of the arrest warrant on October 29, 2019. Mr. Francisco-Estrella is directed to supplement its briefing on this issue and file the entire warrant application within twenty-one days of the date of this decision. The Government is ordered to respond to the Defendant's supplemental brief within twenty-one days of the date it is filed.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: February 5, 2021